UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


ALBERT MINCEY,

              Plaintiff,

v.                                Case No. 3:06-cv-292-J-32TEM

DR. DELA CERNA,
etc.; et al.,

              Defendants.

_____

## ORDER[1]

### I. Status

Plaintiff, an inmate in the custody of the Florida Department of Corrections (hereinafter FDOC) who is proceeding pro se, initiated this case by filing a Civil Rights Complaint (Doc. #1) pursuant to 42 U.S.C. § 1983 on March 30, 2006. He is proceeding on an Amended Complaint (Doc. #8), filed April 17, 2006. Plaintiff names the following Defendants in this action: (1) Manolo Dela Cerna, a physician employed by the FDOC; (2) Ronald Solorzano,[2] a

---

[1] Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the matter addressed herein and is not intended for official publication or to serve as precedent.

[2] Plaintiff misspells Defendant Solorzano's name in the Amended Complaint, referring to this Defendant as Dr. Solarzano. The correct spelling will be utilized in this Order.

physician employed by the FDOC; and, (3) Rachel M. Word,[3] a nurse employed by the FDOC.  Plaintiff alleges that the Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution.  He seeks both punitive and compensatory damages.

This cause is before the Court upon the "Defendants Dela Cerna, Solorzano and (Word) Tillman's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Doc. #28) (hereinafter Motion for Summary Judgment), filed October 2, 2006.  Since Plaintiff is appearing pro se, the Court previously advised him of the provisions of Fed. R. Civ. P. 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond.  See the Court's Order (Doc. #9), filed April 26, 2006, at 3-5.  Plaintiff has responded to the Motion for Summary Judgment.  See "Plaintiff's Response to Defendants['] Motion to Dismiss or Alternative Motion for Summary Judgment" (Doc. #33) (hereinafter Plaintiff's Response), filed October 25, 2006. Thus, the Motion for Summary Judgment is ripe for review.

---

[3] Defendant Word's last name is now Tillman; however, the Court will refer to her as Defendant Word to avoid confusion.

## II.  Summary Judgment Standard

With respect to the standard for granting summary judgment, the Eleventh Circuit Court of Appeals has stated:

> [S]ummary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In re Optical Technologies, Inc., 246 F.3d 1332, 1334 (11th Cir. 2001).

The parties' respective burdens and the Court's responsibilities are outlined as follows:

> The party seeking summary judgment bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact. Taylor v. Espy, 816 F.Supp. 1553, 1556 (N.D. Ga. 1993) (citation omitted). In assessing whether the movant has met this burden, the district court must review the evidence and all factual inferences drawn therefrom, in the light most favorable to the non-moving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material fact. Matsushita Electric Industrial Co. v. Zenith Radio Corp.[,] 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89

L.Ed.2d 538 (1986); <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).

Applicable substantive law will identify those facts that are material. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. <u>Id</u>. For factual issues to be considered genuine, they must have a real basis in the record. <u>Matsushita</u>, 475 U.S. at 586-87, 106 S.Ct. at 1355-56. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. <u>Anderson</u>, 477 U.S. at 249, 106 S.Ct. at 2135. The Court must avoid weighing conflicting evidence or making credibility determinations. <u>Id</u>. at 255, 106 S.Ct. at 2513-14. Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Id</u>. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." <u>Barfield v. Brierton</u>, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

<u>Hairston v. Gainesville Sun Pub. Co.</u>, 9 F.3d 913, 918-19 (11th Cir. 1993).

"It is true that on a motion for summary judgment, all reasonable inferences must be made in favor of the non-moving party." <u>Cuesta v. School Bd. of Miami-Dade County</u>, 285 F.3d 962, 970 (11th Cir. 2002) (citation omitted). "A court need not permit a case to go to a jury, however, when the inferences that are drawn

from the evidence, and upon which the non-movant relies, are 'implausible.'" Id. (citations omitted).

> If a reasonable jury could not find in favor of the nonmoving party, no genuine issue of material fact does exist; and summary judgment is proper. Beal v. Paramount Pictures Corp., 20 F.3d 454, 459 (11th Cir. 1994). A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). As Fed. R. Civ. P. 56(e) states, "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004).

### III.  Plaintiff's Allegations

Plaintiff alleges the following facts in support of his deliberate indifference claim.  At all pertinent times, Plaintiff was incarcerated at Hamilton Correctional Institution (hereinafter HCI), and the Defendants were employed at HCI.  Amended Complaint at 8.

While Plaintiff was incarcerated at Taylor Correctional Institution, he was prescribed Lipitor to treat his high cholesterol.  Id. at 9.  Thereafter, he was transferred to HCI, and during the intake medical examination conducted by Defendant Solorzano, "it was discovered [that] Plaintiff suffered from

5

hypertension."  Id.  At that time, Defendant Solorzano prescribed
Procardia, without first ordering any laboratory tests to aid in
the diagnosis.  Id.  After taking Procardia for seventy-two hours,
Plaintiff started to suffer from severe headaches and sought
medical attention.  Id.

Defendant Word ordered Plaintiff to continue taking Procardia.
Id. at 9A.  Plaintiff continued to take Procardia for approximately
one week; however, he then signed a form to refuse the prescription
due to the severe headaches he was experiencing.  Id.  At that
time, Defendant Word told Plaintiff that he would be scheduled for
an examination and hypertension monitoring.  Id.

Approximately thirty days later, laboratory tests revealed
that Plaintiff had an abnormally elevated liver enzyme count;
therefore, he was scheduled to see Defendant Dela Cerna.  Id.
Plaintiff saw Defendant Dela Cerna approximately thirty days later.
Id.  At this time, Defendant Dela Cerna discontinued Plaintiff's
Lipitor prescription because Plaintiff refused to take Procardia.
Id.

Approximately one week later, Plaintiff had a stroke "and was
emergency evacuated to [a] hospital in Hamilton County [and] then
to Jacksonville Memorial Hospital for treatment."  Id.  The
physicians at Memorial Hospital treated Plaintiff's hypertension
and also prescribed Lipitor.  Id. at 9A-9B.  They told him that his

stroke was caused by a lack of treatment for his hypertension and high cholesterol. <u>Id</u>. at 9B.

The stroke caused Plaintiff to suffer from paralysis on his left side, "incapacitating him to the point of confinement to a wheelchair." <u>Id</u>. This physical incapacitation has caused Plaintiff severe emotional and mental anguish. <u>Id</u>.

## IV. Law and Conclusions

### A. Exhaustion of Administrative Remedies

Defendants move to dismiss Defendant Word from this action on the basis that Plaintiff did not properly exhaust his administrative remedies. The FDOC provides a three-step grievance procedure. First, an inmate must normally file an informal grievance. <u>See</u> Chapter 33-103.005 of the Florida Administrative Code (hereinafter F.A.C.). If the issue is not resolved, the inmate must then file a formal grievance at the institutional level. <u>See</u> Chapter 33-103.006, F.A.C. If the matter is not resolved at the institutional level, the inmate must file an appeal to the Office of the Secretary of the FDOC. <u>See</u> Chapter 33-103.007, F.A.C. However, grievances concerning medical issues "**may** be filed directly with the reviewing authority . . . bypassing the informal grievance step[.]" Chapter 33-103.006(3)(e), F.A.C. (emphasis added).

Defendants argue that Plaintiff did not properly exhaust his administrative remedies because he followed the three-step

7

grievance procedure rather than bypassing the first step of this procedure, as authorized for grievances concerning medical issues. Although the grievance procedure authorizes an inmate to bypass the first step in the three-step grievance procedure, it does not mandate that an inmate do so. Thus, the Court finds this argument unpersuasive.

Defendants also contend that Defendant Word should be dismissed from this action because she was not named in any of Plaintiff's grievances. The United States Supreme Court recently addressed this issue in Jones v. Bock, 127 S.Ct. 910 (2007). In that case, the United States Court of Appeals for the Sixth Circuit had adopted a rule permitting a prisoner to bring a suit against only those defendants who had been identified by the prisoner in his administrative grievances. The pertinent portion of the United States Supreme Court's opinion states the following:

> The PLRA [[Prison Litigation Reform Act)] requires exhaustion of "such administrative remedies as are available," 42 U.S.C. § 1997e(a), but nothing in the statute imposes a "name all defendants" requirement along the lines of the Sixth Circuit's judicially created rule. Respondents argue that without such a rule the exhaustion requirement would become a "'useless appendage,'" Brief for Respondents 44 (quoting Woodford, 548 U.S., at ----, 126 S.Ct. 2378 (slip op., at 11)), but the assertion is hyperbole, and the citation of Woodford misplaced.
>
> Woodford held that "proper exhaustion" was required under the PLRA, and that this requirement was not satisfied when grievances were dismissed because prisoners had missed

deadlines set by the grievance policy.  Id.,
at ----, 126 S.Ct. 2378 (slip op., at 11-13).
At the time each of the grievances at issue
here was filed, in contrast, the MDOC
[(Michigan Department of Corrections)] policy
did not contain any provision specifying who
must be named in a grievance.  MDOC's policy
required only that prisoners "be as specific
as possible" in their grievances, 1 App. 148,
while at the same time the required forms
advised them to "[b]e brief and concise."  2
id., at 1.  The MDOC grievance form does not
require a prisoner to identify a particular
responsible party, and the respondent is not
necessarily the allegedly culpable prison
official, but rather an administrative
official designated in the policy to respond
to particular types of grievances at different
levels.  Supra, at 6.  The grievance policy
specifically provides that the grievant at
Step I "shall have the opportunity to explain
the grievance more completely at [an]
interview, enabling the Step I respondent to
gather any additional information needed to
respond to the grievance."  1 App. 151.
Nothing in the MDOC policy itself supports the
conclusion that the grievance process was
improperly invoked simply because an
individual later named as a defendant was not
named at the first step of the grievance
process.

     Nor does the PLRA impose such a
requirement.  In Woodford, we held that to
properly exhaust administrative remedies
prisoners must "complete the administrative
review process in accordance with the
applicable procedural rules," 548 U.S., at
----, 126 S.Ct. 2378 (slip op., at 5) - rules
that are defined not by the PLRA, but by the
prison grievance process itself.  Compliance
with prison grievance procedures, therefore,
is all that is required by the PLRA to
"properly exhaust."  The level of detail
necessary in a grievance to comply with the
grievance procedures will vary from system to
system and claim to claim, but it is the
prison's requirements, and not the PLRA, that

9

> define the boundaries of proper exhaustion.
> As the MDOC's procedures make no mention of
> naming particular officials, the Sixth
> Circuit's rule imposing such a prerequisite to
> proper exhaustion is unwarranted.

Id. at 922-923.

The Court has thoroughly reviewed the FDOC's regulations regarding the inmate grievance procedure, and these regulations do not contain any provision that specifies who must be named in grievances.  In fact, the only requirements regarding the substance of an inmate grievance are that the completed form be legible, that included facts be accurately stated, and that only one issue or complaint be addressed.   Chapter 33-103.005(2)(b)(2), F.A.C.; Chapter 33-103.006(2)(e)-(g), F.A.C.; Chapter 33-103.007(2)(e)-(g), F.A.C.  Thus, the Court is satisfied that Plaintiff exhausted his administrative remedies by presenting his medical issue through the three-step grievance procedure.

## B. Deliberate Indifference

The following undisputed facts[4] are pertinent in assessing Plaintiff's deliberate indifference claim.  Plaintiff was transferred from Taylor Correctional Institution to HCI on November

---

[4] These facts are set forth in the Defendants' Motion for Summary Judgment and the exhibits appended thereto.  The Court notes that "Plaintiff genuinely accepts Defendants['] statement of facts, except and to the point that Defendants describe Plaintiff's condition of an 'alleged stroke'" on May 21, 2005.  Plaintiff's Response at 1-2.  Thus, unless otherwise noted, the following facts are undisputed by the parties.

24, 2004. Ex.[5] A at 3; Ex. D.   Plaintiff's "Health
Information/Transfer Summary" form, dated November 22, 2004, noted
that Plaintiff was taking the following medications: Albuterol,
Combivent, Theordur, Colace, Prilosec, Lipitor and Atenolol.  Ex.
A at 3; Ex. C-4 at 299.[6]  Plaintiff's "Health Information Arrival
Summary" form, dated November 24, 2004, reflects that Plaintiff was
receiving the following medications: EC-ASA (enteric coated
aspirin), Atenolol, Albuterol, Colace, Lipitor, Percogesic and
Prilosec.  Ex. A at 3; Ex. C-4 at 297.

Defendants describe the medical care Plaintiff received at HCI
from the time he arrived at that institution until May 21, 2005
(the day Plaintiff alleges he had a stroke).

> Shortly after arriving at Hamilton CI,
> inmate Mincey was scheduled for the Chronic
> Illness Clinic. (Exhibits A, C-3 at medical
> excerpt p. 130.)  On December 2, 2004, Mincey
> appeared in the clinic and was examined by
> defendant, Dr. Solorzano. (Exhibits A, C-3 at
> medical excerpt p. 130.)    Dr. Solorzano
> reviewed Mincey's current medications with him
> and noted that inmate Mincey reported that he
> was no longer taking Percogesic or the
> Combivent inhaler. (Id.) Current medications
> for Mincey on December 2, 2004, were EC ASA

---

[5] The Court hereinafter refers to the exhibits in support of
Defendants' Motion for Summary Judgment as "Ex."

[6] Ex. C-1 through Ex. C-5 are excerpts from Plaintiff's medical
record.  The pages from his medical record are numbered on the
bottom right corner of each page; however, the pages in these five
exhibits are not sequentially numbered and do not correspond with
the actual number of pages in the exhibits.   The Court will
hereinafter cite the page numbers imprinted on the bottom right
corner of each page.

(enteric coated aspirin), Colace, Atenolol, Lipitor, Prilosec, Albuterol inhaler. (Id.) Dr. Solorzano discussed recent laboratory tests with inmate Mincey and informed him of the results. (Id.) Dr. Solorzano reviewed and assessed Mincey's following medical conditions and complaints: 1) bronchial asthma, 2) hyptertension, 3) high cholesterol, 4) colon cancer, 5) gastroesophogeal reflux disease (G.E.R.D.), 6) bladder/testicular pain, and 7) feet pains. (Id.) Dr. Solorzano reviewed the medical records and observed that Mincey had a documented history of hypertension and high cholesterol in his medical records since his entry into the system in 2002. (Exhibit A, C-2 at medical record excerpt p. 74-78.) The medical records also revealed that Mincey had reported that both his mother and his older brother had strokes, his mother suffered from diabetes, and his older brother had heart trouble. (Exhibits A, C-2 at medical excerpt p. 72.) On the day of the Chronic Illness Clinic, Mincey's blood pressure was 131/97 and Dr. Solorzano noted that Mincey's control of his blood pressure was only "fair". (Exhibits A, C-3 at medical excerpt p. 130.) Consequently Dr. Solorzano prescribed a new and additional medication, Nifedine (Procardia) ER 30 mg, P.O., q.d. x 150 days, to assist in controlling the high blood pressure. (Exhibits A, C-3 at medical excerpt p. 130, C-4 at medical excerpt p. 150.) Dr. Solorzano renewed Mincey's standing medications for 150 days and directed a followup visit to the Chronic Illness Clinic and laboratory tests in April 2005. (Exhibits A, C-3 at medical excerpt p. 130, C-4 at medical excerpt p. 150.) To address other complaints, Dr. Solorzano directed that Mincey keep a scheduled urology appointment at the RMC [(the Reception and Medical Center)], that he keep up annual eye and dental care, and he authorized Mincey to have special shoes (Brogans) for a year to address his complaints of foot pain. (Exhibits A, C-3 at medical excerpt p. 130.) Other than entering a followup note on the results of the urology

appointment at the RMC on 12/16/04 and reviewing a grievance on a copay on 03/09/05, Dr. Solorzano had no further contacts with inmate Mincey while he was housed at Hamilton CI. (Exhibits A, C-3 at medical excerpt p. 278, C-4 at medical excerpt p. 292.)

On December 8, 2004, inmate Mincey reported to sick call and was seen by LPN M. Hogan. (Exhibits A, B, C-4 at medical excerpt 296.) At this sick call, inmate Mincey complained that the new prescription Nifedipine (Procardia) was causing him headaches and when he does not take the medicine he does not have a headache. (Id.) Mincey advised that he no longer was taking Nifedipine. (Id.) On January 7, 2005, LPN M. Hogan made an incidental entry indicating that inmate Mincey was still refusing to take the Nifedipine. (Exhibits A, B, C-4 at medical excerpt 286.) Nurse Hogan explained the risks to inmate Mincey, who acknowledged that he understood. (Id.) Inmate Mincey was referred to an institutional staff physician, Dr. D. Hall, for additional counseling about the medication. (Id.) At the referral session, Inmate Mincey stated he "just does not want to take it anymore". (Id.) Dr. Hall informed Mincey of the negative impact on his health by not taking the prescribed medication, including the possibility of death. (Id.) The following month on February 3, 2005, inmate Mincey again refused the Nifedipine (Procardia) prescription and signed a refusal before Nurse S. Carlton. (Exhibits A, B, C-3 at medical record excerpt 284.) Mincey was referred to Dr. M. Dela Cerna the following day, where he again refused in spite of counseling on the risks associated with not taking the medication. (Exhibits A, B, C-3 at medical record excerpt 284.) On April 8, 2005, Mincey was seen again in the Chronic Illness Clinic by Dr. V. P. Baitan, another staff physician at Hamilton CI. (Exhibits A, B, C-3 at medical record excerpt 129.) Dr. Baitan noted that Mincey's hypertension appeared controlled during that visit. (Id.) Dr. Baitan also noted that Mincey's laboratory

tests revealed elevated liver function levels. (Exhibits A, B, C-3 at medical record excerpt 129, 271; C-5 at medical record excerpt p. 384 [AST 49, ALT 88 in a range of 0-40].)  Dr. Baitan ordered hepatitis tests to check for liver disease.  (<u>Id.</u>)  Elevated liver function is a reason to discontinue or closely monitor use of "statin" drugs, such as Lipitor. (Exhibits A, B, C-1 at medical record excerpt p. 2, discharge diagnosis #9.)  Although Dr. Baitan ordered additional tests to determine the presence of liver disease, there is no notation that he discontinued the Lipitor prescription at that time.  (Exhibits A, B, C-3 at medical record excerpt 129.)

On April 20, 2005, defendant Dr. Dela Cerna reviewed the results of the hepatitis panel and noted that the test results showed "abnormal" for Hepatitis B.  (Exhibits A, B, C-3 at medical record excerpt p. 270.)

On April 26, 2005, inmate Mincey again refused to take all future doses of the prescribed Nifedipine (Procardia).  (Exhibits A, B, C-3 at medical record excerpt 269.) Nurse M. Hogan explained the risks to inmate Mincey who acknowledged that he understood. (<u>Id.</u>)  Nurse Hogan referred the chart to a staff physician.  (<u>Id.</u>)  On April 27, 2005, Dr. Baitan reviewed the chart and referred the matter for counseling.  (<u>Id.</u>)  On May 3, 2005, Senior Registered Nurse S. Carlton counseled inmate Mincey regarding his refusal to take the Nifedipine (Procardia).  (Exhibits A, B, C-3 at medical record excerpt 268.)  Inmate Mincey indicated that the medication caused him headaches and fatigue, stating: "I cannot take that medication".  (<u>Id.</u>)  Nurse Carlton then ordered blood pressure checks for evaluation by a staff physician to determine whether an alternative treatment was indicated.  (<u>Id.</u>)  At that counseling session, inmate Mincey requested [the] results of his hepatitis tests and request[ed] a doctor's visit to discuss the results.  (<u>Id.</u>)  On May 6, 2005, inmate Mincey met with defendant Dr. Dela Cerna to discuss his hepatitis tests.

(Exhibits A, B, C-3 at medical record excerpt
267.)   There is no indication in the medical
records that Dr. Dela Cerna discontinued the
Lipitor prescription at that time; however,
such a course of action would not have been
inappropriate in light of the elevated liver
function and the history of liver disease, as
statin   therapy   (Lipitor/Procardia)   [is]
generally contraindicated in such instances.
(Exhibits A, B.)

On May 12, 2005, inmate Mincey completed
his week of blood pressure monitoring ordered
by Nurse Carlson and the results were reviewed
by Dr. Baitan, who noted th[at] the blood
pressure was within normal range.   (Exhibits
A, B, C-3 at medical record excerpt p. 267, C-
5 at medical record excerpt p. 370.)

Defendants' Motion for Summary Judgment at 9-14.

On May 21, 2005, at approximately 6:20 a.m., medical staff
responded to Plaintiff's cell, and Plaintiff stated, "I['] m having
[a] stroke."   Ex. C-3 at 265.   The person from the medical
department who completed the "Generic Nursing Assessment" form
noted that Plaintiff had "left sided weakness," that he was unable
to stand or walk without assistance and that his speech was
slurred.   Id.   At approximately 7:45 a.m. that day, Plaintiff was
transported to Trinity Community Hospital.   Id. at 266.

Later that day, Plaintiff was transported to Memorial Hospital
in Jacksonville, Florida, where he was treated and then discharged
on May 27, 2005.   Ex. C-1.   The discharge diagnoses included "left-
sided weakness secondary to cerebrovascular accident" and "chronic
anticoagulation secondary to cerebrovascular accident."   Id. at 2.
A cerebrovascular accident is defined as "[t]he sudden death of

15

some brain cells due to lack of oxygen when the blood flow to the brain is impaired by blockage or rupture of an artery to the brain. A CVA [cerebrovascular accident] is also referred to as a stroke." http://www.medterms.com/script/main/art.asp?articlekey=2676.

As an initial matter, the Court notes that the only fact that appears to be in dispute is whether Defendant Dela Cerna discontinued Plaintiff's Lipitor prescription approximately one week before Plaintiff suffered from a stroke[7] and whether this discontinuation and/or the Defendants' failure to prescribe an alternate drug to replace the Lipitor caused Plaintiff's stroke. See Plaintiff's Response at 5-7. Furthermore, the undisputed facts demonstrate that there is no causal connection between the actions or omissions of Defendants Word and Solorzano and any constitutional deprivation.

"A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation." Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1165 (11th Cir. 2005) (citing Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)), cert. denied, 126 S.Ct. 1914 (2006). Here, it is clear that Defendant Solorzano did not treat Plaintiff at any time after the alleged discontinuation

---

[7] Defendants admit that "[o]n May 21, 2005, Mincey suffered a cerebrovascular accident." Defendants' Motion for Summary Judgment at 33. Thus, it appears they have conceded that Plaintiff had a stroke on May 21, 2005.

of the Lipitor prescription.  Furthermore, Defendant Word, as a nurse, had no authority to prescribe any medications.  Thus, these two Defendants are entitled to summary judgment in their favor.

In any event, it is clear that none of the medical staff at HCI were deliberately indifferent to Plaintiff's serious medical needs.

> To prevail on this claim, Plaintiff "must satisfy both an objective and a subjective inquiry.  First, the plaintiff must prove an objectively serious medical need.  Second, the plaintiff must prove that the prison official acted with deliberate indifference to that need."  Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (internal quotation marks omitted) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curiam).

When describing a serious medical need, the Eleventh Circuit has stated:

> In our circuit, a serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994) (quotation marks and citation omitted).  In either of these situations, the medical need must be "one that, if left unattended, 'pos[es] a substantial risk of serious harm.'"  Taylor, 221 F.3d at 1258 (alteration in original) (quoting Farmer, 511 U.S. at 834, 114 S.Ct. 1970).  Our precedent recognizes a range of medical needs that are sufficiently serious to constitute "serious medical needs" for purposes of the Eighth Amendment and some medical needs that are not.

17

<u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003) (footnotes omitted).  Defendants do not appear to dispute that Plaintiff had a serious medical need.

Therefore, the Court will now address whether the Defendants were deliberately indifferent to that need.  To satisfy the subjective element of a deliberate indifference claim, "Plaintiff must prove three things: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" <u>Bozeman</u> 422 F.3d at 1272 (quoting <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004)).  Although gross negligence does not satisfy this standard, wanton conduct can be "treatment 'so cursory as to amount to no treatment at all[,]'" <u>Taylor v. Adams</u>, 221 F.3d 1254, 1259 (11th Cir. 2000) (citing <u>Ancata v. Prison Health Servs., Inc.</u>, 769 F.2d 700, 704 (11th Cir. 1985)), <u>cert</u>. <u>denied</u>, 531 U.S. 1077 (2001), or delay when it is apparent that delay would exacerbate the medical condition, it does so, and the delay is not medically justified.  <u>Id</u>. (citing <u>Hill v. Dekalb Regional Youth Detention Center</u>, 40 F.3d 1176, 1187-89 (11th Cir. 1994)).

Here, Plaintiff has not satisfied the subjective element of a deliberate indifference claim.  Even assuming his Lipitor prescription was discontinued and no substitute was prescribed, such a temporary discontinuation would have been appropriate according to Defendants Solorzano and Dela Cerna.  Defendant Dela

Cerna states in his affidavit that "based upon the history of [Plaintiff's] liver disease and the elevated liver function reflected in the April 5 laboratory test results (Exhibit C-5 at medical record excerpt p. 384 . . ., it would not have been inappropriate to temporarily discontinue the medication until the liver function levels returned to normal range as statin therapy (Lipitor) generally is contraindicated under those conditions." Ex. B at 6.  Defendant Solorzano also states in his affidavit that "[e]levated liver function is a reason to discontinue or closely monitor use of 'statin' drugs, such as Lipitor." Ex. A at 7.

Plaintiff appears to argue that such a discontinuation was not proper because the physicians at Memorial Hospital prescribed Lipitor and they told him that his stroke was caused by a lack of treatment for his hypertension and high cholesterol. <u>See</u> Amended Complaint at 9A-9B. However, the Court notes that "a difference of opinion over matters of medical judgment does not give rise to a constitutional claim." <u>Tedesco v. Johnson</u>, 119 F.Supp.2d 1320, 1327 (M.D. Fla. 2000) (citing <u>Massey v.  Hutto</u>, 545 F.2d 45 (8th Cir. 1976)).

At most, Plaintiff has presented a claim of negligence, which is insufficient to support an Eighth Amendment violation. <u>See</u> <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991); <u>Daniels v. Williams</u>, 474 U.S. 327, 347 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344 (1986) (noting that the Due Process Clause is not implicated by a

negligent act of an official causing an unintended loss of or injury to life, liberty, or property).

In sum, the record reflects that Plaintiff was repeatedly seen and treated for his various medical conditions during the relevant time period.  Clearly, the Defendants were not deliberately indifferent to Plaintiff's serious medical needs.[8]

## C. Qualified Immunity

Defendants contend that they are entitled to qualified immunity.  The Eleventh Circuit has reviewed the qualified immunity principles.

> "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Gonzalez, 325 F.3d at ----, 2003 WL 1481583, at *3 (quoting Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002)); Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).  To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority. Gonzalez, 325 F.3d at ----, 2003 WL 1481583, at *4 (citing Vinyard, 311 F.3d at 1346).

Cottone v. Jenne, 326 F.3d 1352, 1357-58 (11th Cir. 2003); Ray v. Foltz, 370 F.3d 1079, 1081-82 (11th Cir. 2004).

---

[8] In fact, it appears that his stroke may have been caused, in part, by his refusal to take the Procardia that Defendant Solorzano prescribed to treat his hypertension.

In this case, the Defendants were acting within their discretionary authority.  See Williams v. Consolidated City of Jacksonville, 341 F.3d 1261, 1267 n.13 (11th Cir. 2003); Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002); Hill, 40 F.3d at 1185 n.17 ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority.").

Thus, once the Defendants have established that they were acting within their discretionary authority, the burden then shifts to the Plaintiff to show that the Defendants are not entitled to qualified immunity.  The Supreme Court has established a two-part test to determine the applicability of qualified immunity.

> "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." Hope, 122 S.Ct. at 2513.  If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

Vinyard, 311 F.3d at 1358; Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (stating that a court reviewing a claim of qualified immunity must first determine whether plaintiff has alleged the deprivation of a constitutional right, and if so, then proceed to determine whether that right was

clearly established at the time of the alleged violation); Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003), cert. denied, 541 U.S. 935 (2004).

This Court has found that the Defendants have not violated Plaintiff's constitutional rights. Thus, "there is no need to proceed to the next step of determining if a constitutional right was clearly established." Smith ex rel. Smith v. Siegelman, 322 F.3d 1290, 1298 n.16 (11th Cir. 2003); Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1194 (11th Cir. 2003). It is clear that the Defendants are entitled to qualified immunity.

### D. Eleventh Amendment Immunity

Plaintiff sues the Defendants in their official capacities. "It is well established that a suit against a defendant governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent." Manders v. Lee, 285 F.3d 983, 990 (11th Cir. 2002) (citations omitted).

In Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986) (per curium), the Eleventh Circuit noted:

> It is clear that Congress did not intend to abrogate a state's eleventh amendment immunity in section 1983 damage suits. Quern v. Jordan, 440 U.S. 332, 340-45, 99 S.Ct. 1139, 1144-45, 59 L.Ed.2d 358 (1979). Furthermore, after reviewing specific provisions of the Florida statutes, we recently concluded that Florida's limited waiver of sovereign immunity was not intended to encompass section 1983 suits for damages. See Gamble, 779 F.2d at 1513-20.

22

Accordingly, in <u>Zatler</u>, the court found that the Secretary of the Florida Department of Corrections was immune from suit in his official capacity. <u>Id</u>. Thus, insofar as Plaintiff seeks monetary damages from Defendants in their official capacities, the Eleventh Amendment clearly bars suit.

Accordingly, for all of the above-stated reasons, Defendants' Motion for Summary Judgment will be granted, and judgment will be entered in favor of the Defendants.

Therefore, it is now

**ORDERED:**

1.   "Defendants Dela Cerna, Solorzano and (Word) Tillman's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Doc. #28), filed October 2, 2006, is **GRANTED.**

2.   The Clerk shall enter judgment in favor of the Defendants and close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 12th day of March, 2007.

TIMOTHY J. CORRIGAN
United States District Judge

ps 2/26
c:
Albert Mincey
Assistant Attorney General Susan A. Maher

23